# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| SHARON LEIGH TOLBERT, ) | |
|   Plaintiff ) | |
| ) | |
| ) | Civil Action No. 1:17cv00014 |
| ) | **MEMORANDUM OPINION** |
| NANCY A. BERRYHILL, ) | |
|  Acting Commissioner of Social Security, ) | By: PAMELA MEADE SARGENT |
|   Defendant ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Sharon Leigh Tolbert, ("Tolbert"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Tolbert protectively filed an application for SSI on July 16, 2012, alleging disability as of July 16, 2012,[1] based on mitral valve prolapse; hypokalemia; esophagus erosion; esophagitis intestinal spasms; irritable bowel syndrome; gastritis; arthritis; problems with the rotator cuff of the right shoulder; duodenal ulcers; gastroesophageal reflux disease, ("GERD"); and hiatal hernia. (Record, ("R."), at 224-27, 236, 240.) The claim was denied initially and upon reconsideration. (R. at 116-18, 123-24, 126-28, 130-32.) Tolbert then requested a hearing before an administrative law judge, ("ALJ"). (R. at 133-34.) Hearings were held by video on September 29, 2014, and June 12, 2015, at which Tolbert was represented by counsel. (R. at 43-94.)

By decision dated July 31, 2015, the ALJ denied Tolbert's claim. (R. at 24-37.) The ALJ found that Tolbert had not engaged in substantial gainful activity since July 16, 2012, the application date. (R. at 26.) The ALJ determined that the medical evidence established that Tolbert suffered from severe impairments, namely right shoulder tendinopathy with rotator cuff disorder; irritable bowel syndrome, stable with treatment regimen; history of mitral valve prolapse; mild coronary artery disease; cervicalgia; generalized anxiety disorder; and borderline personality traits, but he found that Tolbert did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26-27.) The ALJ

---

[1] On her SSI application, Tolbert alleged a disability onset date of March 26, 1996; however, at her June 2015 hearing, the alleged onset date of disability was amended to July 16, 2012. (R. at 47.)

found that Tolbert had the residual functional capacity to perform light work[2] that allowed her to stand four to six hours in an eight-hour workday, walk three to four hours in an eight-hour workday and sit six to eight hours in an eight-hour workday; that allowed her to lift and carry items weighing up to 15 pounds with the left upper extremity and up to five pounds with the dominant right upper extremity; that did not require overhead reaching with the right upper extremity; and that did not require her to understand, remember and carry out detailed work instructions. (R. at 29.) The ALJ found that Tolbert was unable to perform any of her past relevant work. (R. at 35.) Based on Tolbert's age,[3] education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Tolbert could perform, including jobs of a cashier, a gate guard and a sales attendant. (R. at 35-36.) Thus, the ALJ concluded that Tolbert was not under a disability as defined by the Act, and was not eligible for SSI benefits. (R. at 36-37.) *See* 20 C.F.R. § 416.920(g) (2017).

After the ALJ issued his decision, Tolbert pursued her administrative appeals, (R. at 13), but the Appeals Council denied her request for review. (R. at 1-3.) Tolbert then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2017). This case is before this court on Tolbert's motion for summary judgment filed September 13, 2017, and the Commissioner's motion for summary judgment filed October 13, 2017.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2017).

[3] As discussed below, the ALJ correctly found Tolbert's age to be 50 as of her alleged onset date, but he incorrectly found that made her a younger person under 20 C.F.R. § 416.963(c).

*II. Facts*

Tolbert was born in 1962, (R. at 224), which, at the time of her alleged disability onset classified her as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d). Tolbert has an eleventh-grade education and past work experience as a sewing machine operator and an inspector in the garment industry. (R. at 62-63, 241.) Tolbert stated that she helped take care of her elderly mother four days a week by cooking for her; doing her laundry; getting her medications and administering them to her; taking her to her doctor's appointments; helping her get dressed; and helping her get in and out of the shower. (R. at 62, 71-72, 269.)

Victor Baranauskas, a vocational expert, also was present and testified at Tolbert's September 2014 hearing. (R. at 90-92.) Baranauskas was asked to identify the exertional level of a home care aide or care giver. (R. at 90.) He stated that these jobs were medium,[4] semi-skilled jobs. (R. at 90.) Baranauskas was asked to consider a hypothetical individual of Tolbert's age, education and no relevant work history, who had the residual functional capacity to perform light work, that did not require more than occasional stooping, crouching and climbing steps; that did not require working around excessively cold temperatures; and who could perform tasks involving no more than short, simple instructions. (R. at 90-91.) In addition, this individual could interact appropriately to supervision, the public and co-workers. (R. at 91.) Baranauskas testified that such an individual could perform light jobs existing in significant numbers in the national economy, including jobs

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2017).

as a fast food worker, a cashier and a cafeteria attendant. (R. at 91.) He stated that these jobs required no more than occasional overhead reaching. (R. at 92.)

On March 20, 2015, Baranauskas completed a set of vocational interrogatories, wherein he was asked to consider an individual of Tolbert's age, education and lack of past relevant work experience, who had the residual functional capacity to perform as indicated in the assessments of psychologist Christopher M. Carusi, Ph.D., and Dr. Paul Robb. (R. at 310-12, 433-35, 440-45.) Wells stated that such an individual could perform unskilled sedentary jobs existing in significant numbers in the national economy, including jobs as a final assembler, a polisher and a machine operator. (R. at 311.) He also stated that such an individual could perform unskilled light jobs existing in significant numbers in the national economy, including jobs as a cleaner, a hand packer and a mail clerk. (R. at 311.)

Asheley Wells, a vocational expert, testified at Tolbert's June 2015 hearing. (R. at 49-53.) Wells was asked to consider a hypothetical individual of Tolbert's age, education and no relevant work history, who could lift and carry items weighing up to five pounds with the right upper extremity; who could perform no overhead reaching with the right upper extremity; who could occasionally reach in all other directions; who could occasionally push and pull with the right upper extremity; and who was right hand dominant. (R. at 49-50.) Wells stated that, the lifting and carrying limitation would require sedentary work, and the reaching overhead limitation precluded sedentary work. (R. at 50.) Wells was asked to consider the same individual, but who could stand four to six hours in an eight-hour workday; walk three to four hours in an eight-hour workday; sit six to eight hours in an eight-hour workday; lift and carry items weighing up to 15 pounds with

the left arm and up to five pounds with the right arm; and who was precluded from reaching overhead with the right upper extremity. (R. at 51.) She stated that according to the Dictionary of Occupational Titles, ("DOT"), the walking restriction would fall into the light exertional category, but the lifting restrictions would fall into the sedentary category. (R. at 51-52.) Wells stated that a significant number of jobs existed in the national economy, including jobs as a cashier, a gate guard and a sales attendant, that such a person could perform. (R. at 52-53.) She stated, however, that her testimony was not consistent with the DOT because the DOT listed these jobs as light. (R. at 52.)

In rendering his decision, the ALJ reviewed records from Dr. Robert McGuffin, M.D., a state agency physician; Dr. Jack Hutcheson, M.D., a state agency physician; Dr. Mark Borsch, M.D.; Cardiovascular Associates; Dr. Lacyoni Moraes-Finglass, M.D.; Johnston Memorial Hospital; Sally Pennings, N.P., a nurse practitioner; Saltville Medical Center; Christopher M. Carusi, Ph.D., a licensed clinical psychologist; Dr. William T. Cummins, M.D.; Abingdon Heart Care and Prevention; Alvin D. McCuiston, P.A., a physician's assistant; University of Virginia Health System; Dr. Jeffrey Neal, M.D.; Dr. Emily Shields, M.D.; Dr. Paul M. Robb, M.D.; and Dr. Jamie C. Goodman, D.O.

On February 12, 2004, cardiologist, Dr. Lacyoni Moraes-Finglass, M.D., saw Tolbert who stated that, since July 2003, she had been having episodes of chest discomfort and occasional palpitations. (R. at 345-47.) A cardiac examination revealed regular rate and rhythm with normal sound and the presence of an audible, but soft, murmur at the left lower sternal border. (R. at 347.) An electrocardiogram, ("EKG"), showed sinus bradycardia with a heart rate of 55

beats per minute. (R. at 347.) Dr. Moraes-Finglass diagnosed chest pain; history of mitral valve prolapse; tobacco abuse; and palpitations. (R. at 347.)

On October 17, 2005, Tolbert was admitted to Johnston Memorial Hospital for complaints of a syncopal episode. (R. at 337-43.) An echocardiogram, ("ECG"), and electroencephalogram, ("EEG"), were unremarkable. (R. at 339.) Her discharge diagnosis was syncope, conversion type. (R. at 339.)

Tolbert was seen by Dr. Mark Borsch, M.D., a cardiologist at Cardiovascular Associates, from January 2006 through February 2014 for mitral valve prolapse; mild regurgitation; fatigue; orthostatic hypotension; palpitations; hematuria; and esophageal spasm. (R. at 314-36, 348-52, 376-81, 426-28.) In July 2007, a stress test showed no evidence of stress induced ischemia. (R. at 335.) In June 2008, an EKG was normal, and Tolbert reported that she was doing well. (R. at 321.) In July 2009, Dr. Borsch reported that Tolbert's pulmonary and neurological examinations were normal. (R. at 319.) He noted a barely audible murmur. (R. at 319.) In June 2010, Tolbert reported that her heart palpitations were better since taking medication; however, she reported that her fatigue had worsened. (R. at 316.) Dr. Borsch reported that Tolbert's examination was normal. (R. at 316-17.) He reported that Tolbert's last two EKGs did not show mitral valve prolapse. (R. at 315.)

On May 18, 2011, Dr. Borsch reported that Tolbert's examination was normal. (R. at 314-15.) On May 26, 2011, a coronary calcification study showed moderately abnormal calcific coronary atherosclerosis. (R. at 320.) In June 2011, a stress test was normal. (R. at 348-49.) On January 28, 2013, and February 24, 2014, Dr. Borsch noted that Tolbert did not have chest discomfort suggestive of

ischemia. (R. at 376, 426.) Tolbert denied palpitations, tachycardia, syncope and presyncope. (R. at 376.) Cardiac examination showed regular rate and rhythm and normal sounds. (R. at 377, 427.) She was advised to stop smoking. (R. at 378.)

On December 8, 2009, Tolbert saw Dr. William T. Cummins, M.D., for complaints of periumbilical pain and dysphagia. (R. at 371-73.) Cardiac examination showed regular rate and rhythm and no murmur. (R. at 372.) Her neurological examination was normal, and she had normal strength in her upper and lower extremities. (R. at 372.) Dr. Cummins diagnosed dysphagia, constipation and periumbilical pain and ordered an esophagogastroduodenoscopy, ("EGD"), and colonoscopy. (R. at 372.) On December 17, 2009, a stomach biopsy showed gastric oxyntic mucosa and a gastroesophageal junction biopsy showed minimal chronic esophagitis. (R. at 374.)

Tolbert was treated at the Saltville Medical Center and Meadowview Health Clinic from November 2011 through June 2014 and was diagnosed with palpitations; GERD; tobacco use disorder; irritable bowel syndrome; bursitis epicondylitis; scapulalgia; myalgias; lymphadenitis, not otherwise specified; and headaches. (R. at 354-59, 383-86, 400-01.) Tolbert was diagnosed with bursitis epicondylitis and scapulalgia in November 2011 after complaining of right shoulder and elbow pain. (R. at 358.) In July 2013, Tolbert reported that medication helped her symptoms of GERD and heart palpitations. (R. at 413.) In October 2012, a cardiac examination revealed that Tolbert's heart had regular rate and rhythm and normal sounds. (R. at 389.) In November 2012, Tolbert reported that medication helped alleviate her palpitations. (R. at 387-88.) Cardiac examination revealed regular rate and rhythm and normal sounds. (R. at 387.)

Tolbert had limited range of motion of the right shoulder with no instability. (R. at 387.)

In December 2013, Alicia Frasure, N.P., a nurse practitioner with Saltville Medical Center, noted that Tolbert made good eye contact, she had normal speech and did not appear to be depressed, anxious or stressed. (R. at 407.) In August 2014, Tolbert complained of neck and right shoulder pain. (R. at 456.) Sally Pennings, another nurse practitioner, reported that Tolbert had full range of motion in her right shoulder and normal strength with no swelling or redness. (R. at 456-57.) X-rays of Tolbert's cervical spine showed mild degenerative change, most prominent at the C5 level with endplate sclerosis, as well as mild anterior osteophyte formation. (R. at 464.) X-rays of Tolbert's right shoulder were normal. (R. at 465.) Pennings diagnosed shoulder bursitis/tendonitis and neck disorder symptoms, not otherwise specified. (R. at 457.) In January 2015, Tolbert continued to complain of right shoulder pain with numbness and tingling in her wrist and hand. (R. at 450.) She reported neck pain after mowing her yard and using a weed eater. (R. at 450.) Tolbert also reported that she helped lift her elderly mother. (R. at 450.) Tolbert was in no acute distress; she had tenderness in the right side of her neck; cardiac examination was normal; her gait was normal; she had no edema in her extremities; and she had good range of motion of the upper and lower extremities. (R. at 451.) In March 2015, an MRI of Tolbert's right shoulder showed mild hypertrophic changes of the acromioclavicular joint with tendinosis of the supraspinatus and no evidence of rotator cuff tear or internal derangement. (R. at 462.)

On September 12, 2012, Dr. Robert McGuffin, M.D., a state agency physician, found that Tolbert had the residual functional capacity to perform light

work. (R. at 99-100.) He found that Tolbert could frequently climb ladders, ropes or scaffolds and crawl. (R. at 100.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 100.)

On January 15, 2013, Tolbert presented to the emergency room at Johnston Memorial Hospital with complaints of chest pain and weakness. (R. at 361-68.) Tolbert had an abnormally low heart rate, but her heart rhythm was regular; she had normal heart sounds with no murmur; no edema was present; her mental activity was normal with good interaction; her sensory and motor function was normal; she had intact range of motion in all extremities; and her circulation was intact in all extremities. (R. at 362.) A chest x-ray showed Tolbert's lungs to be hyperinflated. (R. at 368.) An ECG showed a heart rate of 52 beats per minute with regular rhythm. (R. at 364.) Tolbert was discharged in stable condition with a diagnosis of near syncope. (R. at 364.)

On September 6, 2013, Dr. Jack Hutcheson, M.D., a state agency physician, found that Tolbert had the residual functional capacity to perform light work. (R. at 110-12.) He found that Tolbert could frequently climb ladders, ropes or scaffolds and crawl. (R. at 111.) Dr. Hutcheson opined that Tolbert could frequently reach overhead with her right upper extremity. (R. at 111-12.) No visual, communicative or environmental limitations were noted. (R. at 112.)

On March 13, 2014, Dr. Emily Shields, M.D., saw Tolbert for complaints of headaches, numbness of the right side of her face and blurred vision in her right eye. (R. at 420.) Dr. Shields reported that examination of Tolbert's neck and spine were normal; she had intact recent and remote memory, attention span, concentration and language; her speech and fund of vocabulary were normal; she

had normal and equal muscle strength, bulk and tone in both the upper and lower extremities; and she had a normal gait. (R. at 421.) Dr. Shields diagnosed migraines with and without aura, along with numbness and tingling of the face. (R. at 421.)

On March 6, 2014, Dr. Jeffrey Neal, M.D., diagnosed bilateral temporomandibular joint disorder, ("TMJ"). (R. at 397-99.) On May 14, 2014, Tolbert reported improvement with TMJ symptoms after using Tylenol and a bite guard. (R. at 395-96.)

On November 22, 2014, Dr. Paul M. Robb, M.D., reported that Tolbert was able to sit comfortably, and she had no issues getting onto the examination table. (R. at 437-39.) Cardiac examination showed regular rate and rhythm and a soft mid-systolic click at the left lower sternal border; she had no edema in her extremities; pulses were equal bilaterally in her upper and lower extremities; she had right anterior glenohumeral joint pain with palpation; she had limited range of motion of the right shoulder; she had normal strength, reflexes and sensation in the upper and lower extremities; she had normal alternating upper extremity movement; and she was able to perform heel-to-shin, tandem gait, and toe and heel walk. (R. at 438.) Dr. Robb diagnosed irritable bowel syndrome and right rotator cuff pain, likely related to tendonopathy or partial tear. (R. at 439.) Dr. Robb opined that Tolbert could stand four to six hours in an eight-hour workday; walk three to four hours in an eight-hour workday; sit six to eight hours in an eight-hour workday; lift and carry items weighing up to 15 pounds with her left arm and five pounds with the right arm; and that she could not reach overhead with her right shoulder. (R. at 439.)

On December 10, 2014, Dr. Robb completed a medical assessment, indicating that Tolbert could frequently lift and carry objects weighing up to 10 pounds and occasionally lift and carry objects weighing up to 20 pounds. (R. at 440-45.) He opined that Tolbert could sit up to eight hours in an eight-hour workday and do so for up to six hours without interruption; stand up to six hours in an eight-hour workday and do so for up to three hours without interruption; and walk up to four hours in an eight-hour workday and do so for up to one hour without interruption. (R. at 441.) Dr. Robb reported that Tolbert could frequently reach, handle, finger, feel, push and pull with her left hand; continuously handle, finger and feel with her right hand; and occasionally push, pull and reach, but never reach overhead, with her right hand. (R. at 442.) He reported that Tolbert could continuously operate foot controls, climb stairs and ramps, operate a motor vehicle, work around humidity and wetness, dust, odors, fumes and pulmonary irritants, temperature extremes, vibrations and very loud noise; frequently balance, stoop, kneel, crouch and work around unprotected heights; and occasionally climb ladders or scaffolds, crawl and work around moving mechanical parts. (R. at 442-44.)

On December 10, 2014, Christopher M. Carusi, Ph.D., a licensed clinical psychologist, evaluated Tolbert at the request of Disability Determination Services. (R. at 430-32.) Tolbert reported that she had never been hospitalized for psychiatric treatment. (R. at 430.) She stated that she had received counseling in the 1980s following an overdose of aspirin and Tylenol. (R. at 430.) Carusi reported that Tolbert's speech was clear, organized and goal-directed; she was cooperative and responsive; her affect was blunted, and her mood did not appear to be either depressed or manic; she had no impairment in long-term or immediate memory, but her short-term memory and working memory were somewhat

impaired; and her judgment was adequate. (R. at 431.) Carusi diagnosed generalized anxiety disorder and borderline personality traits. (R. at 432.) He assessed Tolbert's then-current Global Assessment of Functioning, ("GAF"),[5] score at 50.[6] (R. at 432.)

Carusi completed a mental assessment, indicating that Tolbert had a satisfactory ability to understand, remember and carry out complex instructions; to make judgments on complex work-related decisions; and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 433-35.) He indicated that Tolbert had no limitations in her ability to understand, remember and carry out simple instructions; to make judgments on simple work-related decisions; and to interact appropriately with the public, supervisors and co-workers. (R. at 433-34.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2017); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[6] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2017).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Tolbert argues that the ALJ erred by improperly weighing the opinion of Dr. Robb. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 11-14.) Tolbert further argues that the ALJ failed to address the inconsistencies between the vocational expert's testimony and the DOT. (Plaintiff's Brief at 14-15.)

The ALJ found that Tolbert had the residual functional capacity to perform a limited range of light work that allowed her to stand four to six hours in an eight-hour workday, walk three to four hours in an eight-hour workday and sit six to eight hours in an eight-hour workday; that allowed her to lift and carry items weighing up to 15 pounds with the left upper extremity and up to five pounds with the dominant right upper extremity; that did not require overhead reaching with the right upper extremity; and that did not require her to understand, remember and carry out detailed work instructions. (R. at 29.) The Regulations define light work

as the ability to lift items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. § 416.967(b).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Tolbert argues that the ALJ erred by improperly weighing the opinion of Dr. Robb. (Plaintiff's Brief at 11-14.) I find this argument is without merit. Based on my review of the record, it appears that the ALJ gave great weight to Dr. Robb's November 22, 2014, objective findings based on the comprehensive evaluation, noting that such findings were reflective of the medical evidence of record as a whole. (R. at 34.) In fact, the ALJ specifically adopted Dr. Robb's findings that Tolbert would be capable of standing four to six hours; walking three to four hours; sitting for six to eight hours; lifting and carrying items weighing up to 15 pounds with the left arm and five pounds with the right arm; and no overhead reaching with the right arm. (R. at 34, 439.)

Nonetheless, I do not find that substantial evidence exists to support the ALJ's finding that Tolbert was not disabled. First, even a cursory reading of the ALJ's opinion shows that he correctly found that Tolbert was 50 years old at her

alleged onset of disability, but he incorrectly stated that this placed her in the category of a younger person. The ALJ should have found that Tolbert was a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d). As such a person, the Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, would support a finding of disabled if Tolbert were able to perform only sedentary work. *See* 20 C.F.R. Part 404, Subpt. P, App. 2, Rule 201.09 (2017).

Furthermore, I find that the ALJ incorrectly held that the vocational expert's testimony was consistent with the information contained in the DOT when the expert testified that the information was not consistent. Social Security Ruling 00-4p instructs, in part, the following:

> This Ruling clarifies our standards for the use of vocational experts … who provide evidence at hearings before administrative law judges … In particular, this ruling emphasizes that before relying on [vocational expert] … evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] … and information in the Dictionary of Occupational Titles (DOT) … and Explain in the determination or decision how any conflict that has been identified was resolved.
>
> . . .
>
> Occupational evidence provided by a [vocational expert] … generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [vocational expert] … evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert's] … evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the

adjudicator will inquire, on the record, as to whether or not there is such consistency.

. . .

When a [vocational expert] … provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert's] … evidence and information provided in the DOT.

In these situations, the adjudicator will:

> Ask the [vocational expert] … if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the [vocational expert's] … evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

S.S.R. 00-4p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013).

Under the Commissioner's own ruling, the ALJ is under an affirmative duty to inquire into conflicts between the vocational expert's testimony and the DOT. *See Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999) ("We hold that before an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the Dictionary of Occupational Titles, and elicit a reasonable explanation for any discrepancy on this point."); *see also Oxendine v. Massanari*, 181 F. Supp. 2d 570, 573-75 (E.D.N.C. 2001) (concluding that the Fourth Circuit has adopted the rule set out in *Haddock,* noted *supra*, therefore adopting SSR 00-4p).

The ALJ noted that he was relying on vocational expert Wells's June 2015 testimony because it was "more in line with the claimant's residual functional capacity, as denoted in the hypothetical…" (R. at 34.) Wells testified that the restrictions of lifting and carrying a maximum of five pounds and no overhead reaching with the dominant right upper extremity would not be consistent with light work based on the DOT. (R. at 49-50, 52.) Wells further testified that the lifting and carrying restriction would require an individual to perform sedentary work; however, the reaching limitation precluded sedentary work. (R. at 50.) Despite such a direct statement by Wells, the ALJ stated in his decision that, "[p]ursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (R. at 36.) Based on my review of the record, this finding is not supported by the record.

Based on the above-stated reasons, I find that substantial evidence does not support the ALJ's decision denying benefits. I will deny both motions for summary judgment, vacate the decision denying benefits and remand Tolbert's claim to the Commissioner for further development. An appropriate order and judgment will be entered.

DATED: May 23, 2018.

*s/ Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE